UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DEBORAH BYNUM,

                       Plaintiff,

         - against -

NEW YORK CITY TRANSIT AUTHORITY,

                    Defendant.
--------------------------------------------------------X

**MEMORANDUM
A N D  O R D E R**

01 CV 7945 (CLP)

On November 30, 2001, plaintiff Deborah Bynum filed suit against defendant New York

City Transit Authority (the "TA" or "Transit Authority"),[1] alleging employment discrimination

based on the perception that because she suffers from Multiple Sclerosis ("MS"), she was not

qualified to perform the essential functions of her job as TA bus operator. On December 11,

2006, plaintiff proceeded to trial[2] on her claims under the Rehabilitation Act, 29 U.S.C. § 794,

the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York

City Human Rights Law ("NYCHRL"), N.Y. Admin. Code § 8-107.[3]

Following a jury verdict of no liability on the part of the TA on any of plaintiff's claims,

plaintiff now moves for judgment notwithstanding the verdict pursuant to Rule 50(b) of the

---

[1]Plaintiff initially filed suit against the Metropolitan Transportation Authority ("MTA") as well, but the claims against the MTA were dismissed on November 14, 2002.

[2]The parties consented to trial before the undersigned, which was held from December 11-15, 2006.

[3]Plaintiff also initially brought claims under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132. Prior to trial, defendant moved to dismiss plaintiff's ADA claim and moved for summary judgment on her other claims. The district judge before whom the case was pending at that time dismissed the ADA claim by order dated September 2, 2003 ("Order"), but denied defendant's motion for summary judgment.

Federal Rules of Civil Procedure, and, in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. For the reasons set forth below, plaintiff's motion for judgment notwithstanding the verdict or for a new trial is denied.


## DISCUSSION

A. Legal Standards

It is well-settled that a trial court, in determining whether a motion for judgment as a matter of law should be granted, must view the evidence in the light most favorable to the party against whom the motion is made, see Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970), and the non-moving party must be given the benefit of all reasonable inferences that may be drawn in his or her favor from the evidence presented at trial. See id. Judgment as a matter of law should be entered when "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable juror[s] could have reached." Id.; accord Caruso v. Forslund, 47 F.3d 27, 32 (2d Cir. 1995). In other words, judgment as a matter of law should be granted where there is "'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture. . . .'" Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992) (quoting Mattivi v. South African Marine Corp., 618 F.2d 163, 168 (2d Cir. 1980)).

By contrast, when considering a motion for a new trial, the trial court functions in a different capacity. See Song v. Ives Labs., Inc., 957 F.2d at 1047; Bevevino v. Saydjari, 574 F.2d 676, 683-84 (2d Cir. 1978). Unlike a renewed motion for judgment as a matter of law, a

new trial may be granted even where the jury's verdict is supported by substantial evidence. See Song v. Ives Labs., Inc., 957 F.2d at 1047. Additionally, a trial judge is free to weigh the evidence, and is not required to view the evidence in the light most favorable to the verdict winner. See id.; Bevevino v. Saydjari, 574 F.2d at 684. A trial judge may grant a new trial motion if he or she determines that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice, i.e., that the verdict is against the weight of the evidence, that the damages awarded were excessive, or that for stated reasons the trial was not fair to the moving party." Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983) (internal quotations and citations omitted). The Second Circuit has held that the trial judge should view the verdict in light of the overall setting of the trial, should consider the character of the evidence, as well as the complexity or simplicity of the legal issues that the jury was asked to consider, and should decline to interfere with the jury's verdict unless it is quite clear that a seriously erroneous result was reached. See Bevevino v. Saydjari, 574 F.2d at 684.

## B. Plaintiff's Post-Trial Motion

At trial, plaintiff pursued claims of employment discrimination under the Rehabilitation Act, the NYSHRL and the NYCHRL. The Rehabilitation Act provides in relevant part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The jury was instructed that in order to prove a violation of

the Rehabilitation Act,[4] plaintiff must prove by a preponderance of the evidence that: 1) the TA is an employer subject to the Rehabilitation Act, which was conceded by the TA; 2) plaintiff was regarded or perceived as disabled within the meaning of the Rehabilitation Act; 3) that at the time of the events at issue, plaintiff was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; and 4) plaintiff suffered an adverse employment action solely as a result of the disability. (Charge at 21-22; Tr. at 564); see also Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003); Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Community Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999); Heilweil v. Mount Sinai Hospital, 32 F.3d 718, 722 (2d Cir. 1994), cert. denied, 513 U.S. 1147 (1995).

Under the New York State Human Rights Law, the same general elements of proof must be established by a preponderance of the evidence. See N.Y. Exec. Law § 298(a). The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . because of the . . . disability . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." Id. There is one difference between the proof required under the NYSHRL and the Rehabilitation Act in that under the NYSHRL, plaintiff need not prove that the employer's perception of plaintiff as disabled was the exclusive or only reason for its employment decision. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 332, 337-38 (2d Cir. 2000); Mohammed

---

[4] As the district court noted in its earlier Order, the Rehabilitation Act and the ADA impose nearly identical requirements. (Order at 11 (citing Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999), cert. denied, 531 U.S. 864 (2000); Lincoln Cercpac v. Health & Hosps. Corp., 147 F.3d 165, 167 (2d Cir. 1998))). This Court accordingly utilized the model jury instructions for the ADA in creating the jury charge for this case.

v. Marriott Int'l. Inc., 905 F. Supp. 141, 156-57 (S.D.N.Y. 1995). The New York City Human Rights Law, like the NYSHRL, requires proof of all the same elements as the Rehabilitation Act, with the exception of the need to prove that plaintiff's perceived disability was the sole reason for the TA's employment decision. See N.Y.C. Admin. Code § 8-101; see also Parker, 204 F.3d at 332, 337-38; Brower v. Continental Airlines, Inc., 62 F. Supp. 2d 896, 902-03 (E.D.N.Y. 1999).

On the special verdict form given to the jury at the conclusion of the charge, the Court listed several questions tracking the elements of proof under each statute. The first question inquired as to whether the plaintiff had "prove[d] by a preponderance of the evidence that, at the time of the events at issue, she was regarded or perceived by the Transit Authority as suffering from a disability as I have explained that term to you?" The jury answered Question 1 in the affirmative, finding that plaintiff was perceived or regarded by the TA as suffering from a disability. Plaintiff does not quarrel with the propriety of the charge or with the jury's verdict insofar as Question 1 is concerned.

The second question on the verdict form asked if plaintiff "established by a preponderance of the evidence that, at the time of the events at issue, Ms. Bynum was qualified to perform the essential functions of her job as a bus operator with or without a reasonable accommodation." The jury answered this question in the negative, agreeing with the defendant's arguments that Ms. Bynum was not qualified to drive a TA bus. Plaintiff challenges that determination as not supported by the evidence.

In addition, because proof that plaintiff was otherwise qualified to perform the duties of her employment was a prerequisite to recovery, the jury was instructed to report to the Court if

5

they found plaintiff not to be qualified, and therefore, they did not proceed to answer the other questions on the verdict form. Plaintiff contends that it was error for the jury not to have reached the remaining questions on the verdict sheet, arguing that if they had, the evidence would have supported a verdict for plaintiff on all the elements of her claim. Thus, plaintiff seeks judgment notwithstanding the verdict. In the alternative, plaintiff seeks a new trial contending that the verdict reached was against the weight of the evidence. The plaintiff also contends that a new trial is required because the defendant's tardy production of certain letters, and the admission of certain medical records during the trial for impeachment purposes caused undue prejudice and juror confusion.

## C. Evidence Presented at Trial

The evidence introduced at trial demonstrated that plaintiff Deborah Bynum was hired as a bus operator for the Transit Authority on February 24, 1997. (Tr.[5] at 160; see Pl.'s Ex.[6] 40). During the period from February 24, 1997 through April 14, 1999, Ms. Bynum performed the functions of her job as bus operator in a satisfactory manner. (See Tr. at 432, 435; Pl.'s Exs. 7, 23; Def.'s Ex. E). In early October 1997, a neurologist sent plaintiff for an MRI, which reported "findings highly suggestive of multiple sclerosis." (Def.'s Ex. C). In November of 1997, Ms. Bynum was examined at the Maimonides Medical Center in Brooklyn, reporting to the doctors that beginning in August and September of 1997, she experienced "numbness in her feet, knee,

---

[5]Citations to "Tr." refer to the transcript of the trial held before this Court from December 11-15, 2006.

[6]Citations to "Pl.'s Ex." and "Def.'s Ex." refer to the exhibits admitted into evidence at trial.

6

thigh" and a "tingling sensation up and down her spine." (Def.'s Ex. D). In November of 1997, plaintiff reported to Dr. Somasundaram, a physician at Maimonides Medical Center, that she was experiencing problems "gripping the steering wheel tightly." (Def.'s Ex. A).

In 1997, Ms. Bynum saw Dr. Aaron Miller, Director of the Division of Neurology at Maimonides Medical Center. (Tr. at 30; Pl.'s Ex. 90). Dr. Miller sent Ms. Bynum for another MRI in October of 1998 (Tr. at 37-38; Pl.'s Ex. 90), but did not contact her with the results of the test until March of 1999. (See Tr. at 39-40; 165). In April 1999, the doctor prescribed Copaxone, a drug used to slow the progress of MS (Tr. at 39-40), and on April 14, 1999, plaintiff informed the TA that she was taking this medication.[7] (Def.'s Ex. E).

On February 26, 1999, after Ms. Bynum had been seeing Dr. Miller and complaining about her symptoms, but before receiving the Copaxone prescription, plaintiff underwent her periodic medical examination administered by the TA in accordance with Article 19-A of the New York Vehicle and Traffic Law. (Tr. at 164; Pl.'s Ex. 7). Under this section of the law, all bus drivers in New York State are required to undergo a full physical examination, including vision, hearing and urine tests, and receive periodic re-certification that they are fit to drive a bus. N.Y. C.L.S. Veh. & Tr. § 509-b, g, j, k. Dr. Ivan Colef, a TA doctor, conducted Ms. Bynum's February 1999 examination and noted only that she reported a "nervous stomach." (Pl.'s Ex. 7).

---

[7]According to the TA, employees are under a continuing obligation to report medical issues, including medications being taken, to the employer. (Tr. at 345-47, 408). The evidence presented at trial made it clear that Ms. Bynum had been experiencing symptoms for over a year prior to disclosing to the TA the Copaxone prescription and her diagnosis of MS. Although she reported symptoms to her doctors (see Def.'s Exs. C, D; Pl.'s Exs. 90, 90A), she did not report them to the TA despite her obligation to do so under TA rules. (See Pl.'s Ex. 7; Tr. at 165, 198-99, 204-208, 345). Ms. Bynum asserts that she was unaware of her obligation to report changes in her medical condition, testifying that she believed she was only required to report any medications taken. (Tr. at 205).

On the form next to the boxes indicating "muscular disease" or "other nervous disorder," plaintiff had marked "No." (Id.) Plaintiff claimed that she was not aware of the diagnosis of MS until March 1999 when informed by Dr. Miller.[8] (See Tr. at 39-40; 165).

Upon learning that Ms. Bynum was taking Copaxone, the TA immediately placed Ms. Bynum on restricted duty and sent her for a medical examination by Dr. Harriet Dickenson, a TA physician. (Def.'s Ex. E). According to Dr. Dickenson, Ms. Bynum complained at the time of the examination that she had experienced low back pain radiating down her legs. (Id.) Dr. Dickenson placed Ms. Bynum on restricted duty, prohibiting her from operating any TA vehicle. (Id.)

On April 9, 1999, Dr. Miller wrote a letter addressed "To whom it may concern," indicating that the drug Copaxone "has no side effects which impair a person's ability to operate a motor vehicle. Ms. Bynum will unlikely experience any problems which will interfere with her job performance while taking the drug Copaxone." (Pl.'s Ex. 46). On April 15, 1999, Dr. Miller wrote a second letter stating:

> Ms. Bynum has been under my neurological care since November of 1997. The diagnosis of Multiple Sclerosis was confirmed October 1998. Her neurological exam is normal except for minimal decrease of vibratory sensation in left toes. I have recommended that she begin a immuno-modulating drug to slow down disease progression and reduce number of any future relapses.
>
> Ms. Bynum is not by any means a candidate for disability. She

---

[8]Defendant, however, introduced records from Dr. Somasundrun, St. Lukes Roosevelt Hospital, and Dr. Joseph Yellin, indicating that plaintiff had reported symptoms of MS from August of 1997, and an MRI in October of 1997 reported "findings highly suggestive of multiple sclerosis . . ." (See Def.'s Exs. A, B, C). It is thus not entirely clear whether or not plaintiff was aware of her diagnosis prior to Dr. Miller's assessment.

has an essentially normal neurological examination. She has never demonstrated any symptoms other than sensory. It has been shown that it is most beneficial to begin Immuno-modulating drugs as soon as possible after diagnosis in order to prolong the time to any disability.

. . . I would like to add that if Ms. Bynum is removed from her present position or coerced into going on disability I will advise her to seek legal counsel as a direct violation of the American Disabilities Act [sic].

(Pl.'s Ex. 47).

A second medical examination was conducted by Dr. Dickenson on April 21, 1999. (Def.'s Ex. E). Citing TA guidelines, which recommended no driving by someone with MS, Dr. Dickenson specifically noted the characterization of Ms. Bynum's disease by Dr. Miller, but concluded that an independent evaluation was necessary, and referred Ms. Bynum to a neurologist, Dr. Chin. (Id.; Tr. at 177-78, 441-42). Dr. Chin evaluated Ms. Bynum on April 29, 1999.[9] (See Tr. at 186; see also Pl.'s Ex. 23). Dr. Chin recommended that she return to work as a bus operator. (See Tr. at 177-78; see also Pl.'s Ex. 23).

On May 18, 1999, plaintiff was examined by Dr. Colef, an MTA physician, who noted that she had "good muscle power and mobility" and showed "[n]o clinical symptoms or histology

---

[9]Plaintiff submitted a Reply Brief in Support of Her: (1) Renewed Motion Pursuant to Fed. R. Civ. P. 50(B) for Judgment as a Matter of Law and (2) Motion for a New Trial Pursuant to Fed. R. Civ. P. 59, filed on February 9, 2007 ("Pl.'s Reply Br."). Attached as Exhibit A to this document is a series of letters between the TA and Dr. Gilbert, offered in support of plaintiff's motion for a new trial. See infra at 24-25. Exhibit A to Plaintiff's Reply Brief also includes the reports of Dr. Chin and Dr. Gilbert, which do not appear to have been offered into evidence, and accordingly, were not considered by the jury. However, both parties had access to these reports, and referred to them during the trial. (See, e.g., Tr. at 177-78, 186, 419, 441-42). Accordingly, the Court, in evaluating the evidence, has not considered the reports themselves, aside from those references made to the reports by witnesses at trial, or to the extent these reports were referenced in other records that were in evidence.

of MS at the present time." (Def.'s Ex. E). Despite these findings, Dr. Colef placed Ms. Bynum on restricted work status on a permanent basis, precluding her from operating any NYCTA vehicle. (Id.)

Following a Medical Appeal Grievance hearing held in June of 1999, Ms. Bynum was sent to an impartial physician, Dr. Stephen Gilbert, to determine her employment status. (See Tr. at 181; Pl.'s Ex. 28). Dr. Gilbert issued a report in July 1999 in which he advised that she return to work. (See Tr. at 419; see also Pl.'s Ex. 28). The TA requested clarification of the doctor's opinion. (See Tr. at 419[10]). The TA indicated that the question that the doctor should have answered was what the risks for relapse were, in particular the risk of an acute episode occurring on the bus. (See id. at 419). In response, Dr. Gilbert issued an addendum to his report, dated October 6, 1999, concluding that she could return to work. (See id. at 419; see also Pl.'s Ex. 28).

On November 16, 1999, Ms. Bynum was examined again by another TA doctor, Dr. Hermino Valenzuela. (See Tr. at 177, 412). He continued her on restricted work status, noting that the impartial physician, Dr. Gilbert, had not signed the 19-A certificate and therefore, Ms. Bynum would not be permitted to return to work. (Id. at 183, 413). The testimony at trial was unclear as to whether the TA provided the form to the doctor or whether he felt he was not qualified to sign it because it required that the certifying doctor certify, among other things, sight and hearing, which are areas outside of Dr. Gilbert's speciality as a neurologist. (See id. at 183).

At trial, Ms. Bynum produced evidence that on March 29, 2000, the TA reclassified plaintiff, excluding her not only from driving a bus, but from all other "safety sensitive positions"

---

[10]The Court notes that the Transcript here once reads "Dr. Miller," although the testimony is referring to Dr. Gilbert.

that would have required her to drive a TA vehicle. (Id. at 414-15). As a result of the reclassification, plaintiff was left with only two available positions: Cleaner or Transit Property Protection Agent ("TPPA"), neither of which required the skill set of a bus operator. (See id. at 479-82). At trial, plaintiff contended that the reclassification significantly restricted her ability to perform a broad class of jobs, including exclusion from numerous supervisory positions that required driving. (See id.) Plaintiff argued that because of the TA's perception of her as disabled, her preclusion from a broad category of jobs, and the resulting decrease in her salary, she suffered an adverse employment action.[11] (Pl.'s Br.[12] at 7, 8, 21).

In arguing that the jury erred in failing to find that she was qualified to perform the essential functions of her employment position, plaintiff points to the evidence that all of the neurologists who examined her determined that she was qualified to drive a bus. (Id. at 9). Specifically, plaintiff's own physician, Dr. Aaron Miller, testified at trial that he "[did not] believe that Ms. Bynum had any abnormalities that would impair her ability to operate a bus." (Tr. at 46). He made it clear that he believed she was physically capable of performing her duties

---

[11]The TA argued that the reclassification was not an adverse employment action because to the extent that Ms. Bynum's hourly wage as a TPPA was lower than that of bus operator, she was placed in a less stressful job, which the TA argues is a "medical good deed" for someone with MS. (Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment as a Matter of Law or for a New Trial, filed on February 2, 2007 ("Def.'s Mem.") at 8 n.7). Moreover, the TA argues that the wages and loss of seniority experienced by Ms. Bynum were dictated by civil service rules and union policies. (Id. at 8). Finally, the TA contends that she had not established that she was precluded from a broad range of jobs because she could still operate a bus in New York State, even if she was not permitted to drive a TA bus. (See id. at 8). Since the Court finds that there was sufficient evidence to support the jury verdict on the issue of whether she was qualified to drive a bus, the Court does not address these arguments by the TA.

[12]Citations to "Pl.'s Br." refer to Plaintiff Deborah Bynum's Opening Brief in Support of Her: (1) Renewed Motion Pursuant to Fed. R. Civ. P. 50(B) for Judgment as a Matter of Law and (2) Motion for a New Trial Pursuant to Fed. R. Civ. P. 59, filed on January 19, 2007.

and felt she should not have been removed from her position. (See Pl.'s Exs. 46, 47, 49). The

two independent neurologists to whom Ms. Bynum was sent by the TA, Dr. Chin and Dr. Gilbert,

also concurred with Dr. Miller's conclusion and found no physical limitation that would prevent

Ms. Bynum from driving a bus. (Pl.'s Br. at 9; Tr. at 182). Dr. Ivan Colef, a TA physician who

examined Ms. Bynum on February 26, 1999, found that she had passed her physical, including

vision, urine and hearing tests, and had been cleared for "Full Work" status. (Pl.'s Br. at 10).[13]

Dr. Harriet Dickenson, the TA doctor who requested Ms. Bynum's reclassification, examined

Ms. Bynum and found no physical symptoms that would limit her ability to safely operate a

vehicle. (Pl.'s Br. at 10-11).

Indeed, it is clear that the TA's decision to reclassify Ms. Bynum and to find her

unqualified to drive a TA bus was based largely on the Medical Standards. At that time, the

TA's 1998 Revised Medical Standards, then in effect, provided that any employee who was

diagnosed with multiple sclerosis, even if asymptomatic, was not permitted to operate a TA bus

or drive a TA vehicle. (See Tr. at 381, 388-89; Def.'s Ex. J). The TA's medical standards

regarding multiple sclerosis were written substantially by Dr. Edward Isenberg who, although not

a neurologist, relied primarily on Harrison's Principals of Internal Medicine (14th ed. 1998)

("Harrison's") in formulating the TA's policy. (See Tr. at 392, 422). Among the symptoms of

multiple sclerosis described in Harrison's are Lhermitte's symptom, which feels like an electric

---

[13]Later, Dr. Colef advised that plaintiff should be restricted from driving a TA bus, in keeping with TA regulations, because he "found that she's having MS [sic]." (Tr. at 313). According to Dr. Colef, anyone with MS should not drive a bus, which made it "totally unacceptable [for plaintiff] to drive [because of] public safety." (Id.) He explained that MS "symptoms appearing [sic] sometimes suddenly, sometimes slowly, you don't have a trust in that patient that she will stop driving in certain condition. Physically I wouldn't stay in that bus." (Id.)

jolt coursing through the body and sometimes into the legs, and causes numbness of the hands and feet, along with an unsteady gait. (Pl.'s Ex. 6). According to Harrison's, these symptoms can occur "unpredictably" even in patients who are asymptomatic. (Id.)

Based on these symptoms and an understanding of the job requirements of a TA bus operator, which include the use of both of the driver's hands and feet to steer the TA's 48,000 pound busses, the TA adopted the 1998 Medical Standards to ensure that its drivers operated TA buses safely. (Tr. at 389). The TA argued that its adoption of a rule that prevents anyone with multiple sclerosis from driving a TA vehicle was to ensure compliance with New York State's 19-A standards and regulations that are designed to prevent "loss of ability to control and safely operate a bus." (Id.)

The Medical Standards unequivocally state that persons with MS shall not be permitted to drive a TA vehicle. (Id. at 389). The rationale as set forth in the Standards and in Harrison's is the concern that symptoms such as numbness in the hands or feet, or Lhermitte's symptoms could come on unexpectedly and without warning, even where the patient is otherwise asymptomatic. (See Tr. at 386-390). Given the safety concerns implicated by a 48,000 pound vehicle, the TA contends that its policy is medically rational. (Def.'s Mem. at 4). The TA argues that the jury was free to disregard the testimony of doctors unfamiliar with the job requirements of a TA bus driver and conclude that, once diagnosed with MS, plaintiff was no longer qualified to operate a bus. (Id.)

D) Jury's Findings

The jury was asked to determine whether plaintiff had established by a preponderance of

13

the evidence presented at trial that Ms. Bynum was otherwise "qualified to perform the essential functions of her job as a bus operator with or without a reasonable accommodation." (Tr. at 564). The EEOC has defined the "essential functions" of a job to include the "'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1) (1996)), cert. denied, 522 U.S. 1112 (1998). Courts have afforded employers "'considerable deference'" in determining what functions are essential for any given position. Shannon v. New York City Transit Authority, 332 F.3d 95, 100 (2d Cir. 2003) (quoting D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998)). Included among the things considered by courts in the employers' determination are the pertinent medical standards. See Shannon v. New York City Transit Authority, 332 F.3d at 101.

Thus, in Shannon, the court considered the Transit Authority's Medical Standards, which required all bus driver applicants to pass color vision tests, to be an essential function of the job of a Transit Authority bus operator. Id. at 103. The fact that New York State law permits a bus driver to obtain a waiver of the color vision standard was found not to be material, nor did it "disentitle NYCTA from enforcing a higher standard for its own drivers." Id. at 102 (citing Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 571 (1999)). The court in Shannon explained that "NYCTA has a statutory responsibility to operate the transit system 'for the safety of the public,'" and that it was appropriate for the Transit Authority to make employment decisions based on a consideration of the public interest. Shannon v. New York City Transit Authority, 332 F.3d at 103 (citations omitted). The court explained:

> A NYCTA bus driver guides a vehicle weighing thirteen tons

14

> and carrying up to 70 passengers, works eight hour shifts in all
> kinds of weather, and is required to spot traffic hazards from all
> directions and from a distance. Color differentiation is a quali-
> fication that NYCTA may properly deem essential for driving a
> bus because it conduces to the safety of passengers and because
> it serves to limit NYCTA's tort liability in situations where color-
> blindness might cause an accident as well as where it may be
> alleged to have done so. . . . No reasonable jury could find
> otherwise.

Id. (citations omitted).

In Burton v. New York City Transit Authority, 244 F. Supp. 2d 252 (S.D.N.Y. 2003), the court found that the plaintiff, who was taking an anticoagulant medication, could not be certified under state law and was disqualified by the Transit Authority Medical Standards from driving a bus because the Transit Authority had determined that the potential side effects of the medication posed a substantial risk that he would not be able to operate the bus safely. The court explained that "[i]t is self-evident that the bus operator position is extremely safety-sensitive" and that there is an "indirect risk" that a bus driver taking this medication "could fast become an unreasonable risk to the public." Id. at 262. "Indeed, it is easy to imagine the massive liability NYCTA would incur if any one of these risks materialized." Id. The court in Burton concluded that "[i]n the bus driving context, a relatively small risk is unreasonable and unacceptable, and the NYCTA standards that mandate this result do not violate city, state or federal anti-discrimination law." Id. at 263.

Similarly, in Siederbaum v. City of New York, 309 F. Supp. 2d 618, 630 (S.D.N.Y. 2004), aff'd, 121 Fed. Appx. 435 (2d Cir. 2005), the court, relying on Burton and Shannon, concluded that the "risks associated with bipolar disorder, whether treated or untreated, however slight the risks might be, support the Transit Authority's conclusion that the absence of bipolar

disorder is an essential function of being a bus driver." The court found that there was no violation of the ADA because the Transit Authority had concluded that it could not certify that an individual with bipolar disorder meets the safety requirements promulgated under Article 19-A. Id. at 629 (citing 15 N.Y. Comp.Codes R. & Regs. § 6.10(b)(8)). The court recognized that not only must the Transit Authority certify that its bus drivers meet the state safety regulations and operate the buses in a way that "'ensures the safety of the public,'" but the Transit Authority "has a substantial and reasonable interest in avoiding the liability that would follow should any of the risks associated with bipolar disorder actually materialize and cause an accident." Id. at 630 (internal citations omitted). In granting summary judgment in favor of the defendant, the court stated: "All of these factors counsel in favor of deferring to the Transit Authority's conclusion that the absence of bipolar disorder is an essential function of being a bus driver." Id.

In the instant case, the evidence presented at trial demonstrated that the Transit Authority, in determining what the essential functions of a bus operator should be, had adopted a Medical Standard that made it clear that persons with MS, treated or untreated, were unable to perform their job because the Transit Authority had to certify, pursuant to Article 19-A, that their drivers could safely operate a bus, without risk of "loss of ability to control" that bus. (See Tr. at 389). The Medical Standards were based on the rationale that certain symptoms of MS that have a direct effect on one's ability to control a 48,000 pound bus, including numbness of the hands and feet or Lhermitte's symptoms, could come on unexpectedly even where the individual was asymptomatic and under treatment. (Id. at 386-390). Like the Transit Authority's determination with respect to color blindness or bipolar disorder, the decision to prohibit persons with MS from driving a bus was based on the Transit Authority's need to operate the transit system for the

16

public safety and to reduce the risk of "'massive liability.'" <u>Siederbaum v. City of New York</u>, 309 F. Supp. 2d at 630.

At trial, the jury could have concluded that despite the neurologists' opinions, Ms. Bynum's condition rendered her unfit to safely drive a bus. Putting aside the TA's Medical Standards, the evidence showed that Ms. Bynum had been experiencing significant symptoms of MS prior to the time that she reported to the TA that she was taking Copaxone. (<u>See</u> Def.'s Exs. A, B, C). As early as August of 1997, she began experiencing symptoms that suggest Lhermitte's symptom, complaining of numbness in her feet, knee and thigh, and a tingling up and down her spine. (<u>Id.</u>) In November of 1997, she complained to a doctor of difficulties "gripping the steering wheel tightly." (<u>Id.</u>) Nevertheless, for more than a year and a half, she continued to operate a TA bus without mention of these symptoms to her employer. (<u>See</u> Pl.'s Ex. 7). The jury could reasonably have concluded, as argued by the TA and as common sense suggests, that numbness in one's feet and an inability to grip the steering wheel might impact on one's ability to safely drive a bus - - an essential function of the position. (<u>See</u> Def.'s Mem. at 3-4). The evidence, uncontradicted by the plaintiff, was that the TA vehicles driven by plaintiff weigh upwards of 48,000 pounds and require a great deal of strength to control, particularly in emergency situations. (<u>See</u> Tr. at 337).

Based on the evidence, the jury could have concluded that because plaintiff failed to report these symptoms to her employer prior to March of 1999, there was no assurance that she would report the onset of any other symptoms in the future. Although the various neurologists who examined plaintiff testified that at the time she was asymptomatic and capable of driving a bus, they all conceded that MS was unpredictable and there was no way to determine when, if

17

ever, she would experience another episode. Thus, while plaintiff argued that during the entire period she was driving a TA bus, including from October 1998 through March 1999 when she was experiencing symptoms of MS, she performed the essential functions of her job satisfactorily and without incident (Pl.'s Br. at 10), the jury was not compelled to agree that the fact that she did not experience an episode during this time meant that she was able to perform the essential functions of the job. Despite the evidence that several independent neurogists and her own treating physician found her qualified to drive a bus, the TA doctors perceived her as unqualified and placed her on restricted duty based solely on her MS. (See Def.'s Ex. D). Plaintiff argues that no "fair minded and reasonable persons" should have found her unqualified. (Pl.'s Br. at 10). Yet the jury was also presented with evidence of about the unpredictable nature of MS (Tr. at 390), along with the medical records of plaintiff (Def.'s Exs. A - E; Pl's Exs. 90, 90A), and the difficult and dangerous nature of driving a bus in New York City (Tr. at 357-60), from which it was free to come to a different conclusion.

Viewing the evidence in the light most favorable to defendant, at this Court must, see, e.g., Simblest v. Maynard, 427 F.2d at 4, the Court finds no basis on which to overturn the jury's verdict on this element. Accordingly, the jury's verdict for defendant stands, and the Court does not reach the matters raised as to the potential answers to the remainder of the verdict sheet.

E) Individualized Assessment

While at no point challenging the actual jury instruction,[14] plaintiff's papers in support of

---

[14]Plaintiff also fails to argue that the structure of the verdict form was improper, although she speculates that had the jury been allowed to proceed to the additional questions on the verdict form it would have found in favor of plaintiff. (See Pl.'s Br. at 15-29).

her pending motions occasionally refer to the TA's lack of an "individualized assessment of Ms. Bynum" as a basis for overturning the jury's verdict, implying that the argued lack of such an assessment was sufficient for plaintiff to have prevailed on her claim. (See Pl.'s Reply Br. at 2). This discussion is for the most part cabined in plaintiff's argument that the jury should have reached the question of whether defendant established a business necessity or direct threat defense. (See id.) On one occasion, however, plaintiff argues that the jury should more generally have found against defendant on the question of whether Ms. Bynum was qualified to do her job because defendant failed conduct such an individualized review. (See id. at 7). There is some question as to whether or not such an individualized assessment is necessary in determining whether plaintiff was able to perform the essential elements of her position.[15]

While the Supreme Court has yet to rule on this question, it addressed the issue in a footnote in Albertson's v. Kirkingburg, 527 U.S. at 569 n.15 (1999), noting that the government in that case urged the court to "read subsections (a) and (b) together to mean that when an employer would impose any safety qualification standard, however specific, tending to screen out individuals with disabilities, the application of the requirement must satisfy the ADA's 'direct

---

[15]In denying defendant's earlier motion for summary judgment, the district court found that the TA did not establish a direct threat defense because it did not make the type of "individualized assessment" articulated in Albertson's Inc. v. Kirkingburg, 527 U.S. at 569. The court noted that all of the neurologists concluded that her condition would not interfere with her ability to drive a bus and that the TA's reliance on the Medical Standards, without any statistical support as to the likelihood of recurrent attacks, constituted "barely more than a blanket rejection of all individuals with this disability which not only may foster further untested assumptions about this disease and those suffering with it but also closes off individual assessments for those challenging the conduct of the NYCTA." (Order at 18). However, the district court appears to have addressed this argument squarely toward defendant's *defense* that Ms. Bynum presented a direct threat. The jury, on the other hand, found that plaintiff had failed to establish that plaintiff had established her prima facie case, and thus had no need to consider the question of whether or not defendant had established a direct threat defense based upon an individualized assessment.

threat criterion . . . [which] ordinarily requires "an individualized assessment of the individual's present ability to safely perform the essential functions of the job . . . ."'" The Supreme Court declined to rule on whether this was in fact the proper interpretation of the statute, instead deciding the case on other grounds. See id. It did note, however, that "it might be questioned whether the Government's interpretation, which might impose a higher burden on employers to justify safety-related qualification standards than other job requirements, is a sound one. . . ." Id. n.15.

The Second Circuit has likewise failed to address whether or not such an interpretation of the statute is valid, although it affirmed a district court which noted that "persuasive authority suggests that an employer's safety-related qualification standard, when applied across-the-board rather than on an individual basis, need not meet the ADA's 'direct threat' standard of individualized assessment." Siederbaum v. City of New York, 309 F. Supp. 2d at 629 n.4 (citing cases). The court in Siederbaum considered qualification standards in assessing plaintiff's prima facie case of discrimination because "an individual with a disability is not otherwise qualified for an employment position . . . if the individual fails to meet [permissible] qualification standards." Id. at 629 (citations and quotations omitted). That court also, however, noted that defendant "must show that the qualification was job-related and consistent with business necessity; it is not required to engage in an individualized assessment." Id. at n.4.

While legal gymnastics between the prima facie elements of a case and the defenses available when a plaintiff has established these elements have taken place in courts considering summary judgment, this Court, with the input of both parties, elected to utilize the model jury charge for the ADA, which more clearly delineated the prima facie elements of the case and the

20

defenses available to defendant. The parties were given multiple opportunities for input into the language and structure of both the jury instruction and the verdict sheet, including the design of the verdict sheet that directed the jury to report to the Court if it found that plaintiff was not a qualified individual, an element necessary for plaintiff to prove its prima facie case. (See, e.g., Tr. at 485-499). When defendant suggested that the issue of the TA's discretion regarding medical standards be discussed in the "essential elements" section of the charge, rather than in the portion addressing defendant's "direct threat" defense, plaintiff opposed this, stating that "[w]e think it belongs where it is, which is a business necessity and the standard in the defense portion of the burdens." (Tr. at 492). In ruling in *plaintiff's* favor, the Court noted that "were we to ask this jury to try to consider [the medical standards] in two different places [it would be] . . . overly confusing." Even plaintiff's own proposed jury charge, submitted on December 4, 2006 ("Pl.'s Charge"), fails to include any discussion of an individualized assessment during the essential elements portion of the instruction. (See Pl.'s Charge at 8).

To the extent that plaintiff is complaining about the verdict form's direction to the jury not to consider the remaining questions on the verdict sheet once it had determined that Ms. Bynum was unable to perform the essential elements of her position, her complaint is untimely. The Court presented the parties with multiple opportunities for input on the jury instruction and verdict form, yet plaintiff never complained of this aspect of the verdict sheet, and in fact failed to preserve any objection to it or the jury charge. (See Tr. at 496-497). Plaintiff passingly suggests in her Reply Brief that "plaintiff did not have the benefit of a finalized jury verdict form at the time the pre-verdict motion was made." (Pl.'s Reply Br. at 4). In fact, at the time that the parties made their pre-verdict motions, the matter of the verdict sheet was discussed, and the only

suggestion raised by the parties (and agreed to by the Court), was that "plaintiff" and "defendant" be underlined on the sheet, to reinforce which party had the burden for each question. (Tr. at 496-97). Plaintiff had yet another opportunity to raise issue with the verdict sheet when the jury sent a note to the Court asking "are the questions to be answered sequentially or all need to be answered before returning to court? For example, on question 2, we answered no and it states to go back to court. Please clarify." (Tr. at 595; Ct. Ex. 2). The Court responded to the note on the record but out of the presence of the jury, by stating "I think the verdict form is clear. What should I do?" (Tr. at 595). Plaintiff failed to object or even suggest that the Court do anything contrary to the verdict sheet's instructions. (See Tr. at 595). Accordingly, the jury was directed to follow the instructions on the verdict sheet, and it shortly returned with a verdict in favor of defendant. (See Tr. at 595, 597).

This Court has nonetheless considered the validity of plaintiff's argument on this matter, and finds it to be without merit. The instructions to the jury were in keeping with the model jury charge for the ADA, and there was ample evidence on which the jury could have based its finding that plaintiff was unable to perform the essential elements of her position. Plaintiff failed to establish a prima facie case, and the jury had no need to consider the validity of any of defendant's defenses.

## MOTION FOR A NEW TRIAL

Plaintiff bases its motion for a new trial on the assertion that the trial was unfair, see Mallis v. Bankers Trust Co., 717 F.2d at 691, arguing that she "was prejudiced by the admission of certain evidence of the medical notes of doctors who did not provide an opinion to the TA

22

regarding Ms. Bynum's ability to continue to operate a bus. . ." and by defendant's tardy production of letters from Ms. Bynum's files regarding her visits to Dr. Gilbert's offices, and the 19-A certification process.[16] (Pl.'s Br. at 29, 30).

### 1) Admission of Medical Records

Plaintiff argues that the Court improperly permitted defendant to admit the medical records of Dr. Somasundaram, Dr. Ahmed and Dr. Sadiq, arguing that they had no probative value as to defendant's decision to place Ms. Bynum on restricted work status during the relevant time period, and were both prejudicial to plaintiff and confusing to the jury. (Pl.'s Br. at 29, 30). Defendant responds that there is no evidence of prejudice or confusion, that plaintiff put the matter of her medical condition at issue, that the documents were consistent with the records of plaintiff's witness, Dr. Miller, and that they "merely amplified or reinforced what Dr. Miller's records had reported." (Def.'s Mem. at 10-11).

The Court addressed this issue prior to the trial by Order dated November 22, 2006 ("Pretrial Order"), when deciding numerous disputes about proposed witnesses and trial exhibits. (Pretrial Order at 1-3). Plaintiff made a motion in limine, arguing that "these medical records were only obtained by defendant as part of discovery and were never reviewed by the Transit Authority doctors prior to the reclassification, . . .[thus] they are irrelevant and, if introduced, will confuse the jury as to what was actually known by the NYCTA at the time of the decision." (Pretrial Order at 2). In that pre-trial Order, this Court determined that "the records may be

---

[16]To the extent that plaintiff bases its motion for a new trial on the argument that the jury's verdict was against the weight of the evidence, this Court has already noted that the jury's verdict was reasonable. See supra at 16-18.

23

relevant to assessing the credibility of the plaintiff and in determining what weight to give the statements of plaintiff's physician, Dr. Miller, who does not appear to have been provided with a complete explanation of plaintiff's symptoms." (Id.) The Court narrowly bracketed the inclusion of these records, holding that "defendant may use the statements made by plaintiff to her doctors, as reflected in these records, during cross-examination of both the plaintiff and Dr. Miller." (Id. at 2-3).

The Court additionally offered, if appropriate, to "issue a limiting instruction, telling the jury to consider the records only for the limited purposes of assessing the credibility of the witnesses and warning the jury that because the doctors at the Transit Authority did not have this information at the time of their analysis of plaintiff's conditions, these records cannot be considered by the jury in determining the reasonableness of the TA's decision." (Id. at 4). This Court then noted that "such an instruction would appropriately balance the probative value and the potential prejudice, however slight, from the introduction of these records." (Id.) Thus, the Court carefully weighed the admission of these records, and limited their use to prevent undue prejudice to plaintiff or confusion to the jury. Plaintiff has failed to establish that this determination was inappropriate, and merely speculates that because the jury decided against her that she must have been prejudiced by the inclusion of these records. In fact, when defendant moved for the admission of these records at trial, plaintiff failed to renew her objection, and declined to even ask the Court to issue a limiting instruction. (See Tr. at 81, 85, 88). Accordingly, the Court denies plaintiff's motion for a new trial based on the admission and limited use of these records.

2) Late Production of Documents

Finally, plaintiff asserts that she was "prejudiced by defendant's production on the third day of trial of highly relevant letters from Ms. Bynum's files regarding her visits to Dr. Gilbert's offices." (Pl.'s Br. at 30).[17] According to plaintiff, these letters "went directly to Ms. Bynum's qualifications to perform the essential functions of her job as bus driver, the very issue on which the jury found that plaintiff did not meet its burden." (Id.) Defendant responds that these were merely "logistical letters - - never admitted into evidence - - concerning Dr. Gilbert's assessing of Ms. Bynum's medical condition and fitness to drive. The actual assessment by Dr. Gilbert was, of course, provided to plaintiff long ago . . . ." (Id. at 11).

When this issue arose during the trial, plaintiff objected, arguing in part that "if I had the letters even last week when I took discovery of David Hyland, I could have explored these letters with him and seen what his response would be. Now I have no idea what David Hyland's response is going to be." (Tr. at 297-98). The Court offered to allow plaintiff to immediately depose David Hyland, who was being called by defendant to explain the 19-A process, in order to allow any potential concerns of plaintiff to be addressed, while also permitting the trial to continue. (Tr. at 298-99). Plaintiff elected not to avail herself of this option. The Court does not find that the delay in production of these documents, where plaintiff already possessed the report of Dr. Gilbert, and where plaintiff was given the opportunity to depose a relevant witness on the topic but declined to do so, to be sufficiently prejudicial to grant a new trial.

Accordingly, plaintiff's motion for a new trial pursuant to Rule 50 is hereby denied.

---

[17]The letters in question included one laying out guidelines for the impartial evaluation of TA employees, and others between Dr. Gilbert and the TA regarding Ms. Bynum. (See Pl.'s Reply Br., Ex. A). These included a letter from the TA requesting that Dr. Gilbert issue an addendum to his report addressing risk of an attack while driving. (Id.)

<u>CONCLUSION</u>

For the above mentioned reasons, plaintiff's motion for judgment as a matter of law and

for a new trial is denied.

**SO ORDERED.**

Dated:  Brooklyn, New York
            May 15, 2007

_____
Cheryl L. Pollak
United States Magistrate Judge